**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**


**JAMES STRANGE, on behalf of**                                    **PLAINTIFF**
**Jennifer Johnson, deceased**


**v.**                          **NO. 4:24-cv-00309-PSH**


**MARTIN O'MALLEY, Commissioner**                        **DEFENDANT**
**of the Social Security Administration**


## MEMORANDUM OPINION AND ORDER


In this case, plaintiff James Strange ("Strange"), on behalf of
Jennifer Johnson ("Johnson"), deceased, challenges the denial of
Johnson's applications for a period of disability, disability insurance
benefits, and supplemental security income payments. Strange does so on
the ground that the findings of an Administrative Law Judge ("ALJ") are
not supported by substantial evidence on the record as a whole.[1] Strange
maintains that the ALJ failed to consider how Johnson's mental

---

[1]    The question for the Court is whether the ALJ's findings are supported by
"substantial evidence on the record as a whole and not based on any legal error." See
Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a
preponderance, but enough that a reasonable mind would accept it as adequate to
support the [ALJ's] conclusion." See Id. "Legal error may be an error of procedure, the
use of erroneous legal standards, or an incorrect application of the law." See Lucus v.
Saul, 960 F.3d 1066, 1068 (8th Cir. 2020) (internal quotation marks omitted).

impairments affected her work attendance, the ALJ failed to properly evaluate the medical opinions of a consulting clinical psychologist, the record does not support the ALJ's finding regarding Johnson's manipulative limitations, and the record does not support the ALJ's finding that Johnson could have performed the physical demands of light work. Because substantial evidence on the record as a whole supports the ALJ's findings, his decision is affirmed.

Johnson was born on January 24, 1978, and was thirty-five years old on May 1, 2013, the alleged onset date of her disability. Her applications were denied more than once at the administrative level. At the judicial review level, though, they were remanded for additional consideration on two separate occasions. Johnson passed away on September 12, 2021, as a result of an acute myocardial infarction, and Strange, her husband, was made a substitute party. See Transcript at 1988-1989. The relevant period in this case is thus from May 1, 2013, the alleged onset date, up to September 12, 2021, the date of Johnson's death.[2]

---

[2]       The ALJ found, and substantial evidence on the record as a whole supports the finding, that Johnson's earnings record shows she acquired sufficient quarters of coverage to remain insured for purposes of disability insurance benefits through December 31, 2016. Strange is therefore required to show proof of Johnson's disability "on or before that date in order [for her] to be entitled to a period of disability and disability insurance benefits." See Transcript at 1802.

The ALJ summarized the evidence relevant to Johnson's impairments, and the parties do not challenge his summary. The Court will not reproduce the summary but simply notes the following evidence in order to place Strange's assertions of error in context.

With respect to Johnson's mental impairments, the record reflects that she suffered from impairments that included borderline personality disorder, depression, and anxiety. She received treatment largely in the form of therapy/counseling on multiple occasions between what appears to have been August of 2013 and September of 2021.[3] As a part of treatment, she was prescribed medication that included Trileptal, Zoloft, Diazepam, Alprazolam, Ativan, Adderall, Xanax, and Wellbutrin.

In January of 2014, Johnson saw Dr. Catherine Hubbard Adams, Ph.D., ("Adams") for a mental diagnostic evaluation. See Transcript at 601-607. Johnson reported, inter alia, a history of sexual abuse, marital difficulties, unstable relationships, and poor social interactions. Her attempts at work were typically accompanied by problems, as she reported being reprimanded on several occasions for her attitude and behavior. Adams

---

[3]    Specifically, Strange represents, and the Court accepts, that Johnson sought treatment largely in the form of therapy/counseling on twenty-six occasions in 2014, twenty-nine occasions in 2015, forty occasions in 2016, twenty-one occasions in 2017, twenty occasions in 2018, three occasions in 2019, nine occasions in 2020, and eleven occasions in 2021. See Docket Entry 11 at CM/ECF 58.

assigned Johnson a Global Assessment of Functioning ("GAF") score of

forty-eight and diagnosed her with a borderline personality disorder "based

on her unstable relationships with family and friends, history of abuse,

histrionic behavior, and exaggerated perception of rejection, pain, and

illness." <u>See</u> Transcript at 605.[4] As to the effects of Johnson's mental

impairments on her adaptive functioning, Adams opined the following:

> How do mental impairments interfere with this person's
> day to day adaptive functioning? ... Claimant's difficulties
> interfere with age-appropriate social interactions, shopping
> and tangential conversation. She reportedly manages all other
> ADLs independently.

> Capacity to communicate and interact in a socially
> adequate manner? ... Claimant's interactions during interview
> were awkward. She misconstrued several prompts made by
> examiner as a request for her to put herself in vulnerable
> situations. This seemingly indicates challenges with having
> boundaries for herself, with [perceiving] others as persistently
> crossing her boundaries, and with crossing other boundaries
> without permission.

> Capacity to communicate in an intelligible and effective
> manner? Claimant communicated in a manner that was
> effective and intelligible.

---

[4]     The GAF is a "numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning on a hypothetical continuum of mental health-illness." <u>See</u> <u>Halverson v. Astrue</u>, 600 F.3d 922, 925 n.4 (8th Cir. 2010) (internal quotation marks and citation omitted). The score is the clinician's judgment of the individual's "overall level of functioning, not including impairments due to physical or environmental limitations." <u>See</u> <u>White v. Colvin</u>, 129 F. Supp. 3d 813, 823 n.1 (E.D. Mo. 2015) (citation omitted). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of between forty-one and fifty represent "serious" severity of symptoms or functional impairment. <u>See</u> <u>Id</u>.

Capacity to cope with the typical mental/cognitive demands of basic work-like tasks? Claimant seems to have difficulty coping with work-type demands. Due to her social interactions, she will likely follow some instructions and not others, causing her to be an unreliable employee. She also would likely be unpredictably agitated if she has perceived rejection or abasement in an instruction, which likely happens frequently due to her askew perceptions.

Ability to attend and sustain concentration on basic tasks? The claimant seems to have difficulty attending and sustaining concentration on basis tasks. She seems to be looking for inherent messages of rejection or abasement in common instructions. This seems to distract her regularly.

Capacity to sustain persistence in completing tasks? It seems claimant has difficulty sustaining persistence in completing work tasks due to unpredictable misperceptions.

Capacity to complete work-like tasks within an acceptable timeframe? Claimant seems to have little difficulty completing tasks within an acceptable timeframe. She seems to either complete the task within an acceptable timeframe or not complete the task at all.

See Transcript at 605-606.

In 2014, Johnson's medical records were reviewed by state agency consultants Drs. Susan Daugherty, Ph.D., and Kay Cogbill, M.D. They agreed that Johnson could perform work where interpersonal contact is incidental to work performed; complexity of tasks is learned and performed by rote, with few variables and little judgment; and the supervision required is simple, direct, and concrete. See Transcript at 87, 142.

As to Johnson's manipulative limitations, the record reflects that she experienced pain, numbness, and tingling in her upper extremities throughout the relevant period. Testing indicated that the problems were caused largely by "mild entrapment of the ulnar nerve bilaterally at the level of the elbow," "severe entrapment of the right median nerve in the carpal tunnel," and "moderate entrapment of the left median nerve in the carpal tunnel." See Transcript at 397. Her left side appeared to be affected to a greater extent than her right side. See Transcript at 848.

Johnson underwent a right carpal tunnel and cubital tunnel release in August of 2013. Although the procedure initially provided some relief from her symptoms, the relief was short-lived. She soon began to again experience pain, numbness, and tingling in her right arm and wrist and had reduced grip strength.

Johnson sought medical attention for her upper extremity complaints throughout the remainder of 2013 and into 2014. See, e.g., Transcript at 659-662, 663-666, 750-751, 610-612, 836-841, 890-895. She also received physical and occupational therapy, which produced mixed results, see, e.g., Transcript at 780-782, 773-774, 464-522, 768-770; was given injections, see, e.g., Transcript at 667; and was prescribed medication that included Norco, gabapentin, Ultram, and hydrocodone.

6

Although Johnson continued to experience pain, numbness, and tingling in her upper extremities throughout the remainder of the relevant period, she sought medical attention less frequently for her complaints. See, e.g., Transcript at 2250-2253, 2261-2263, 2221-2222, 2284-2287. Her major joints and muscle groups were routinely within normal limits for range of motion and strength. At a July of 2021 presentation, though, she had positive Phalen and Tinel tests in her wrists and pain in her shoulders and elbows. See Transcript at 2285. She continued pain management and continued to take prescription medication that included Percocet.

With respect to Johnson's other physical impairments that impacted her ability to work during the relevant period, the record reflects that she experienced pain in her neck and back. Although MRI testing of her cervical spine produced largely unremarkable results, see, e.g., Transcript at 395-396, 671-672, 859-860, MRI testing and x-rays of her lumbar spine and pelvis over the course of what appears to have been three years revealed a likely explanation for her pain. The testing and x-rays revealed, inter alia, "[l]ower lumbar facet arthropathy," "[d]egenerative disc disease at L5-S1 with prominent reactive endplate changes," and "[m]ild degenerative changes involving both [sacroiliac joints]." See Transcript at 1611. See also Transcript at 1612-1613, 1618-1619, 1608-1609.

Johnson sought medical attention for her neck and back pain on a number of occasions throughout the relevant period. For instance, in February of 2014, she presented to Dr. Sunil Gera, M.D., complaining of pain in her neck, shoulders, and upper extremities. See Transcript at 610-612. She had a moderately restricted range of motion in her neck and severe tenderness in her back. She was given medial nerve branch blocks in her cervical spine, which did not produce the desired results.

Johnson was also treated by a specialist, Dr. Calin Savu, M.D., or one of his associates. See, e.g., Transcript at 1589-1592, 1571-1587. Johnson typically had pain and a decreased range of motion in her lumbar spine and sacrococcygeal area. She was treated with medial branch blocks, steroid injections, radiofrequency neurolysis, and medication that included Norco. She also received physical therapy but again only obtained minimal benefit.

Johnson continued pain management treatment for her neck and back pain for the remainder of the relevant period. She typically had an antalgic gait and a decreased range of motion in the cervical and lumbar portions of her spine. See, e.g., Transcript at 1564, 2255, 2259, 2272, 2286. She was prescribed medication that included Oxycodone and Percocet, and physical therapy and medial branch blocks were recommended. She also underwent right-side radiofrequency neurotomy at the L4-L5 level.

With respect to Johnson's other physical impairments that impacted her ability to work during the relevant period, the record reflects that she also experienced pain in her knees. The pain was attributed primarily to osteoarthritis and obesity. MRI testing of Johnson's right knee revealed "[p]atellofemoral and medial femorotibial compartment chondromalacia," see Transcript at 865, and MRI testing of her left knee revealed "[m]ild chondromalacia patella." See Transcript at 877.

In January of 2015, Johnson presented to a health care provider complaining of pain and stiffness in her knees. See Transcript at 884-887. Upon examination, she stood sixty-seven inches tall and weighed 259 pounds, having a Body Mass Index of 40.71 and placing her within the morbidly obese range. She had knee pain, tenderness to palpation, with mild edema on the right side. She was prescribed medication that included Norco and Voltaren and referred for physical therapy.

Johnson continued to report, and seek medication attention for, pain and stiffness in her knees, although she routinely denied difficulty walking. See, e.g., Transcript at 870-872, 897-923, 1562-1566, 1761-1787. She continued to receive pain management, take medication that included Voltaren, use warm/cold packs, and apply an over-the-counter muscle rub for her symptoms.

The record contains a summary of Johnson's work history. See, e.g., Transcript at 2089, 2091-2106. The summary reflects that she had an inconsistent work history, having last worked a few days in 2012 as a health care professional.

Johnson completed a series of reports as a part of her applications. See Transcript at 307-309, 310-318, 346-348, 362-370. With respect to her mental impairments, she represented, in part, that she could not work well with others and became irritated quite easily. She had difficulty following instructions, completing tasks, and concentrating. She was fired from her last job for displaying a bad attitude and behavior. She did not handle stress well, hated changes in her routine, and stayed in her pajamas most days because she did not feel like getting dressed.

With respect to Johnson's physical impairments, she represented, in part, that she was in constant pain. She had difficulty using her hands, especially her right hand, and had a limited ability to grip and lift. She could, though, perform some household chores and could shop for groceries. She estimated that she could stand/walk, and sit, for no more than about thirty minutes before she began to experience pain.[5]

---

[5]    Johnson's son prepared a third-party function report that is consistent with the reports she prepared. See Transcript at 319-328.

Johnson testified at the first two administrative hearings, <u>see</u> Transcript at 39-66, 966-983, and Strange testified at the hearing held after Johnson's passing, <u>see</u> Transcript at 1882-1914. Their testimony reflects that Johnson had a high school education and a degree as a licensed practical nurse. She lived with her children and eventually with Strange. With respect to Johnson's mental impairments, her depression was so severe that she stayed in her bedroom most days. She had insomnia, severe mood issues, and could become aggressive. She had trouble getting along with people and had been married four times. She received regular in-home counseling and pain medication management for her symptoms.

With respect to Johnson's physical impairments, Johnson and Strange testified, in part, that Johnson spent most of her day reading or watching television. Her children helped her with most of the household chores and grocery shopping. She had difficulty using her hands and fingers to grasp and hold objects and estimated that she could lift no more than ten pounds. She also had difficulty standing from a seated position because of the pain in her back and knees. The medication she took, and the therapy she received, was largely ineffective. She estimated that she could stand, walk, and sit for about ten to fifteen minutes before she began to experience pain.

The ALJ assessed Johnson's residual functional capacity and found that she was capable of performing light work with additional limitations. The additional physical limitations included the following:

> ... the claimant would be limited to occasional climbing of ramps and stairs; she would be limited to occasional stooping, kneeling, crouching, and crawling; she would be limited to occasional overhead reaching; she could perform occasional pushing and pulling with her right upper extremity; and she could do occasional fingering, handling, and feeling. She could be exposed to only occasional extreme cold and vibration. She would not be able to climb ladders, ropes, or scaffolds. ...

See Transcript at 1807. The ALJ gave Adams' medical opinions only "some weight" because they are "somewhat consistent" with the record. See Transcript at 1833. The ALJ found at step five of the sequential evaluation process that there was work Johnson could have performed.

Strange maintains that the assessment of Johnson's residual functional capacity is flawed for four reasons. Johnson maintains that the ALJ failed to consider how Johnson's mental impairments affected her work attendance, the ALJ failed to properly evaluate Adams' medical opinions, the record does not support the ALJ's finding regarding Johnson's manipulative limitations, and the record does not support the ALJ's finding that Johnson could have performed the physical demands of light work.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007).

Having reviewed the record in this case, the Court finds that the ALJ's assessment of Johnson's residual functional capacity is supported by substantial evidence on the record as a whole. The Court so finds for the reasons that follow.

The impact of Johnson's absenteeism on her ability to work. Strange first maintains that the treatment of Johnson's mental impairments "would have caused her to be absent from work on multiple occasions per month." See Docket Entry 11 at CM/ECF 57. Strange maintains that the ALJ should have "inquired and made specific findings regarding the effect of Johnson's absenteeism on her ability to work." See Docket Entry 11 at CM/ECF 60.

"Employment can be precluded by impairment-related frequent absences." See Lane v. Berryhill, No. 4:17-cv-02393-ERW, 2019 WL 952069, 5 (E.D. Mo. Feb. 27, 2019). For an individual to have the residual functional capacity to perform a certain type of work, she must have the ability to "perform the requisite acts day in and day out, in the sometimes

competitive and stressful conditions in which real people work in the real world." <u>See</u> <u>Lucas T. S. v. O'Malley</u>, No. 23-cv-0663-JRT-DLM, 2024 WL 365320, 6 (D. Minn. Jan. 8, 2024) (internal quotation marks and citations omitted), report and recommendation adopted <u>sub</u> <u>nom</u>. <u>T. S. v. O'Malley</u>, No. 23-cv-0663-JRT, 2024 WL 364531 (D. Minn. Jan. 31, 2024).

The ALJ here made no specific finding regarding the effect of Johnson's absenteeism on her ability to work. The ALJ's failure to do so, though, does not warrant a remand. Strange bears the burden of showing the extent to which Johnson's mental impairments impacted her work attendance, <u>see</u> <u>Austin v. Commissioner of the Social Security Administration</u>, No. 3:22-cv-00100-JTK, 2023 WL 2967889 (E.D. Ark. Apr. 17, 2023), and Strange has failed to make that showing.

Specifically, Strange has failed to produce evidence indicating how Johnson's mental impairments would have caused excessive absenteeism. Without question, Johnson's medical history reflects numerous mental health-related appointments for treatment and medication. Strange construes each appointment to have required Johnson to miss an entire day of work, but the Court is not persuaded that Strange can simply count the number of days Johnson attended the appointments and then surmise that each appointment would have required her to miss an entire day of work.

Notwithstanding the foregoing, the Court has examined the progress notes from the days Johnson received treatment for her mental impairments. The treatments were in the form of therapy/counseling and medication management appointments. The treatments were not psychiatric hospitalizations or what the Commissioner of the Social Security Administration ("Commissioner") characterizes as "partial hospitalization program[s]." See Docket Entry 13 at CM/ECF 6. The notes reflect that the treatments lasted approximately forty to fifty minutes. It is not clear why an approximately forty to fifty minute treatment would have required Johnson to have been absent from work for an entire day.

The Commissioner additionally notes that mental health-related treatments do not necessarily have to be scheduled during work hours, citing Austin v. Commissioner of the Social Security Administration, supra, and Greenwald v. Saul, No. C18-119-LTS, 2020 WL 1318793 (N.D. Iowa Mar. 20, 2020), for that proposition. The Court agrees with the proposition. The Court has no idea if Johnson's treatments could have been scheduled for a time outside of the typical eight hour work day or required her to miss an entire day of work. Strange has certainly not shown that the treatments had to have occurred during the typical work day or required Johnson to miss an entire day of work.

The evaluation of Adams' medical opinions. Strange next maintains that the ALJ failed to properly evaluate Adams' medical opinions. It is Strange's contention that the ALJ's reasons for giving only "some weight" to Adams' opinions are flawed for two reasons. First, the ALJ's finding that Adams' opinions do not constitute substantial evidence on the record as a whole misstates the law, as a one-time medical consultant's opinions can be credited if they are supported by better or more thorough medical evidence than other opinions. Second, the ALJ's other reason for giving only "some weight" to Adams' opinions—they are somewhat inconsistent with the treatment record—is merely a conclusion.

In assessing a claimant's residual functional capacity, the ALJ must weigh the medical opinions. See Bradford v. O'Malley, 104 F.4th 1055 (8th Cir. 2024).[6] Although a one-time, consulting physician's opinions are typically accorded only limited weight, see Anderson v. Heckler, 738 F.2d 959 (8th Cir. 1984), there are exceptions, see Anderson v. Barnhart, 344 F.3d 809 (8th Cir. 2003). Any opinion, even a treating physician's opinion, may be discounted if it is inconsistent with other substantial evidence. See Michel v. Colvin, 640 Fed. Appx. 585 (8th Cir. 2016).

---

[6]    The regulations governing the consideration of medical opinions were revised for claims filed on or after March 27, 2017. Here, the parties agree that Johnson's claims were filed prior to March 27, 2017, and the old regulations apply.

The Court is not prepared to find that the ALJ misstated the law. Although a one-time, consulting physician's opinions can be given great weight, the ALJ is not required to give them such weight. The ALJ can discount the opinions, if the record as a whole warrants doing so. The ALJ here declined to give Adams' opinions great weight, instead giving them "some weight," because they are only "somewhat consistent" with the record. The ALJ could find as he did, as his decision is supported by the record as a whole, and the ALJ could and did find that the opinions, so weighed, do not constitute substantial evidence on the record as a whole.

The primary reason the ALJ gave for giving Adams' medical opinions only "some weight"—they are "somewhat inconsistent" with the record—is an acceptable reason for weighing the opinions as the ALJ did. For instance, the ALJ could and did observe that although Johnson had a long history of treatment for her mental health issues, the record reflects "some improvement in [her] symptoms when she was [compliant] with medication and therapy." See Transcript at 1834. There is support in the record for that finding, as she periodically reported that her symptoms improved with medication and therapy. See, e.g., Transcript at 1379-1384, 1365-1366, 1357-1358, 1348-1349, 1338-1339, 1336-1337, 1334-1335, 1315-1316, 1248-1249, 2312-2314, 2340-2343.

The ALJ could and did also observe that there were "several situational issues she dealt with related to others in her household and financial concerns." <u>See</u> Transcript at 1834. There is certainly support in the record for that finding, as she repeatedly reported, <u>inter alia</u>, a history of abuse, difficulties in her marriage and with her children, having to live in the same home with a number of other people, and anxiety about her financial and physical problems. <u>See</u>, <u>e.g</u>., Transcript at 53, 601, 1225, 1296, 1331, 1430, 2315.

The ALJ could and did also observe that "[t]he evidence failed to show that [Johnson's] daily activities were severely restricted due to emotional causes." <u>See</u> Transcript at 1834. There is support in the record for that finding. Although Johnson reported that she stayed in her bedroom most days, she acknowledged that she could, <u>inter alia</u>, attend to her self-care and personal hygiene, prepare meals, perform simple household chores, pay her bills, attend medical appointments, shop, and drive. <u>See</u> Transcript at 310-318, 362-370. Any limitation in her daily activities appears to have been caused more by her physical impairments than her mental impairments.[7]

---

[7]     The ALJ also accorded Adams' medical opinions only "some weight" because Adams only examined Johnson once. <u>See</u> Transcript at 1833. The ALJ did not err in making note of that fact.

The evaluation of Johnson's manipulative limitations. Strange next maintains that the record does not support the ALJ's finding regarding Johnson's manipulative limitations. Strange notes that no physician gave an opinion about Johnson's manipulative limitations, and "the ALJ's duty to develop the record requires some opinion evidence from a treating or examining doctor regarding [Johnson's] work-related restrictions ..." See Docket Entry 11 at CM/ECF 65. Strange also maintains that "it is highly unlikely that Johnson could handle and finger up to one-third (occasionally) of a normal workday." See Docket Entry 11 at CM/ECF 65.

Strange's assertion of error warrants no relief for two reasons. First, the ALJ assesses a claimant's residual functional capacity based on all of the relevant evidence, "including the medical records, observations of treating physicians and others, and [the claimant's] own description of [her] limitations." See Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017) (internal quotation marks and citations omitted). There is no requirement, though, that "every aspect" of the assessment be supported by a specific medical opinion. See Twyford v. Commissioner, Social Security Administration, 929 F.3d 512, 518 (8th Cir. 2019). The assessment must simply be supported by some medical evidence of the claimant's ability to function in the workplace. See Id.

It is true that the assessment of Johnson's manipulative limitations is not supported by a specific medical opinion. As noted, though, there is no requirement that "every aspect" of a claimant's residual functional capacity be supported by a specific medical opinion, as long as the assessment is supported by some medical evidence of her ability to function in the workplace. As the Court will more fully outline below, there is some medical evidence for the manipulative limitations found by the ALJ, and he could find as he did.

Second, with respect to the medical evidence relevant to Johnson's manipulative limitations, the record reflects that the ALJ considered, inter alia, the results of medical testing, which revealed mild entrapment of the ulnar nerve bilaterally at the level of the elbow, severe entrapment of the right median nerve in the carpal tunnel, and moderate entrapment of the left median nerve in the carpal tunnel. See Transcript at 1825. The ALJ considered Johnson's August of 2013 carpal tunnel and cubital tunnel release and the limited relief the procedure provided. See Transcript at 1825-1826. The ALJ considered Johnson's use of, and benefit from, pain medication and the results she obtained from twenty-four therapy visits. See Transcript at 1826. The ALJ also noted the absence of meaningful treatment in subsequent years, noting the following:

> ... There was no indication of any further surgery on either
> upper extremity. There was also little indication of any
> complaints or related treatment of her upper extremities until
> a pain clinic visit in July of 2021 noted issues in both wrists and
> elbows. However, other than a refill of her ongoing narcotic
> pain reliever, there was no indication of any prescribed
> treatment.

See Transcript at 1827. Having considered the foregoing medical evidence, the ALJ found that Johnson's manipulative limitations were such that she could have performed occasional pushing and pulling with her right upper extremity and could have performed occasional fingering, handling, and feeling. The Court is not prepared to say that the ALJ erred in so finding. There is some medical evidence to support the manipulative limitations he found, and he could find as he did.[8]

Johnson's ability to perform light work. Strange last maintains that the record does not support the finding as to Johnson's ability to perform the physical demands of light work. Specifically, Strange maintains that given Johnson's back pain, she could not have performed the prolonged standing, walking, and sitting requirements of light work, and the ALJ erred when he relied largely on the opinions of state agency physicians who never examined Johnson and whose opinions were offered in 2014.

---

[8]    There is also some non-medical evidence to support the manipulative limitations found by the ALJ.

Light work requires, in part, that a claimant be capable of standing or walking for a total of six hours during an eight hour work day. See Frankl v. Shalala, 47 F.3d 935 (8th Cir. 1995). Light work also requires, in part, that she be capable of sitting most of the time. See Stone v. Colvin, No. 4:14-cv-494-ACL, 2015 WL 1433469 (E.D. Mo. Mar. 27, 2015).

Strange's assertion of error warrants no relief, as the ALJ adequately considered the evidence relevant to Johnson's back pain. For instance, the ALJ considered the medical testing of Johnson's back throughout the relevant period. See Transcript at 1828-1830. The ALJ considered the treatment Johnson received for her pain, treatment in the form of, inter alia, medial branch blocks, steroid injections, radiofrequency neurolysis, medication, and physical therapy. See Transcript at 1828-1830. The ALJ could and did properly characterize the treatment as "conservative," see Transcript at 1830, not requiring surgical intervention. The ALJ could and did also consider that Johnson did not use an assistive device to walk; "most examination notes showed a normal gait and station," see Transcript at 1830; and her symptoms improved with medication, findings that all have support in the record, see, e.g., Transcript at 1494-1498, 1489-1494, 1486-1489, 1482-1486, 1478-1482, 1475-1478, 1472-1475, 1468-1471, 1465-1468, 1462-1465, 1459-1462, 1571-1575, 1567-1570, 1562-1566.

The ALJ additionally considered the non-medical evidence relevant to Johnson's back pain and its impact on her ability to stand, walk, and sit, doing so pursuant to 29 C.F.R. 404.1529 and 416.929. See Transcript at 1823-1825. The ALJ considered such things as precipitating and aggravating factors; the type, dosage, effectiveness, and adverse side-effects of her pain medication; and her daily activities. With respect to Johnson's daily activities, the ALJ could and did discount her description of them, largely because the description was inconsistent with other evidence in the record.

Strange faults the ALJ for relying on the opinions of the state agency consultants. The Court is not persuaded that the ALJ erred by giving their medical opinions "some weight," see Transcript at 1832, 1835, as he could and did observe that their opinions were but one of the reasons for finding as he did.

"It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the [ALJ's] decision if that decision is supported by good reason and is based on substantial evidence." See Dillon v. Colvin, 210 F.Supp.3d 1198, 1201 (D.S.D. 2016). In fact, the Court may not reverse the ALJ's decision merely because substantial evidence would have supported an opposite decision. See Id.

The evidence in this case is such that the ALJ could have found Johnson's residual functional capacity to have precluded her from working. The ALJ, though, did not so find. The ALJ instead found Johnson's residual functional capacity to be such that she was capable of having performed a reduced range of light work, and the ALJ's findings are supported by substantial evidence on the record as a whole. Accordingly, Strange's complaint is dismissed, and all requested relief is denied. Judgment will be entered for the Commissioner.

IT IS SO ORDERED this 15th day of November, 2024.


_____

UNITED STATES MAGISTRATE JUDGE